## ATCHISON, T. & S. F. RY. CO. v. JARBOE LIVESTOCK COMMISSION CO.

### No. 3340.

Circuit Court of Appeals, Tenth Circuit.
Jan. 27, 1947.

M. M. Gibbens, of Oklahoma City, Okl. (Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., and Biddison & Rheam, of Tulsa, Okl., on the brief), for appellant.

William K. Powers, of Tulsa, Okl., for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This in an appeal from a judgment of the District Court awarding damages to a shipper of livestock for loss of weight allegedly caused by the negligent failure of the carrier to notify the shipper of a delay in the arrival time of the train on which the livestock was to be shipped. The primary question is whether the facts support the trial court's findings of negligence, and if so, whether it applied the correct measure of damages. The case was tried to the court without a jury, and its factual findings are not in material dispute.

Jarboe Livestock Commission Company (herein called shipper), ordered twenty-five cars for the shipment of cattle on April 11, 1944, over the Santa Fe Railroad (herein called carrier). Ten of the cars of cattle were to be shipped to Hamburg, Iowa, eleven to Toronto, Kansas, and four to Oklahoma. The four carloads destined to Oklahoma were weighed and sold at Dodge City, and are not involved in this suit. The other

twenty-one cars were contracted to be sold to consignees at the intermediate point of Emporia, Kansas, based on dry weights there, plus an allowance of 5% for contemplated shrinkage during the trip from Dodge City to Emporia. After weighing, feeding, and watering at that point, the cattle were to be reloaded and continue to their respective destinations of Hamburg and Toronto. The bills of lading, or shipping contract, provided for the shipment to the respective destinations, with feeding and resting at Emporia, but did not stipulate that the cattle were to be weighed or sold at that point.

Shipper began driving the cattle from its ranches to Dodge City, a distance of ten or twelve miles, early on the morning of April 11th. The cattle arrived at the loading pens about 3:30 or 4:00 o'clock in the afternoon, and shipper began preparations for feeding and watering before loading. Before, however, the cattle had time to take on any substantial amount of feed and water, an employee of the railroad notified him to begin loading immediately, because the train on which the cattle were to be shipped would pick them up at 6:00 P.M. Shipper completed the loading of the cattle, without feeding and watering them, by 6:00 o'clock, but the train did not pick up the cars and depart from Dodge City until 12:50 A.M. the next day.

This stock train ran daily, but due to priority of troop and passenger trains, and other congested wartime conditions, it was not adhering to a strict schedule. A severe snow storm had swept Eastern Colorado and Western Kansas, and communications were impaired, but carrier's agent at Dodge City received information at 12:45 P.M. on the 11th that the train would arrive at 6:30 P.M.; at 3:12 P.M. it was reported to arrive at 5:45 P.M.; at 3:34 P.M. it was reported to arrive at 6:00 P.M., and at 7:46 P.M. the time of arrival was given as 10:00 P.M. The crew to take over at Dodge City and operate the train Eastward was called at 9:30 P.M. It was customary to call the train crew about one and one-half hours prior to expected departure.

At Garden City, Kansas, some distance from Dodge City, the conductor of the train was ordered to pick up ten cars of sheep at Cimarron, Kansas, a station nineteen miles west of Dodge City. The train reached Cimarron at 4:00 P.M., but because of congested traffic conditions and loading time, it did not depart from Cimarron until 9:30 P.M. finally reaching Dodge City at 11:10 P.M. After picking up the cattle cars, the train departed from Dodge City at 12:50 A.M. on the 12th, arriving at Emporia at 2:15 P.M. the same day, twenty-three hours after loading time. The cattle were unloaded at Emporia and sold dry weight, after which they were fed, watered, and reloaded to continue the trip to final destinations.

By this suit, shipper seeks to recover damages for the amount of excessive shrinkage caused by the alleged negligent delay in the transportation of the cattle. It is alleged that by reason of this negligent, careless and unlawful delay, and by denying it an opportunity to feed and water the cattle before loading, they suffered excessive shrinkage in weight, to the shipper's damage, in the amount of $5,928.36.

The carrier's defense in the trial court and here is that it received and forwarded the shipper's cattle with reasonable dispatch, taking into consideration the congested traffic conditions due to the war effort, and the disruption of communication lines due to the severe storm on the day preceding the shipment. In that connection, it pleads the provisions of the shipping contract to the effect that except in cases of its negligence proximately contributing thereto, it is not liable for any loss or damage to the livestock caused by an act of God, such as the storm, authority of law, such as wartime priorities, or to transport the livestock otherwise than with reasonable dispatch.

 This defense would undoubtedly be good under the facts as against the charge of negligent delay in the operation of the train. Indeed, the trial court specifically rejected the shipper's plea of negligence in the operation of the train from the time of its departure at Dodge City until it arrived at Emporia, holding that the movement between these two points was "handled with reasonable dispatch". But the trial court's judgment does not rest upon the alleged negligent operation of the train, either be-

fore or after its arrival in Dodge City. It is based squarely upon the proposition that no matter how meritorious the excuses offered for delay in transportation, the duty nevertheless rested upon the carrier to inform the shipper of the known delay, and that the breach of that common law duty was not lessened by the plea of a "busy railroad", citing Ott v. Atchison, T. & S. F. R. Co., 102 Kan. 254, 169 P. 957. Nor did the provisions of the shipping contract exculpate it from the duty to notify. The cause of action based upon such breach of duty sounds in tort, not contract, and is therefore governed by common law principles rather than any duty imposed by statute or contract. Other courts have recognized and applied the rule under facts which leave no doubt of its applicability here. Ott v. Atchison, T. & S. F. R. Co., supra; Holland v. Hines, Mo.App., 234 S.W. 366; St. Louis & S. F. R. Co. v. Vaughan, 88 Ark. 138, 113 S.W. 1035; Texas & P. R. Co. v. Moore, Tex.Civ.App., 119 S.W. 697; Chicago R. I. & P. R. v. Stallings, 132 Ark. 446, 201 S.W. 294; 10 C.J., Sec. 412, 13 C.J.S., Carriers, Sec. 199.

The trial court found that the carrier knew, or should have known, that the departure of the cattle train would be delayed far beyond the time given the shipper when it ordered the cattle loaded without feed and water, and that a timely word to the shipper would have insured proper handling of the cattle, thus obviating the long wait without feed and water in the Dodge City yards. It was pointed out that at Garden City, many miles west of Dodge City, the carrier learned that the train would have to load ten cars of sheep at Cimarron, which would reasonably take two hours and fifteen minutes; that at Cimarron, the carrier knew of the greater delay occasioned by loading and side tracking for priority trains; and that such information should have been transmitted to Dodge City and to the shipper. To further emphasize the carrier's "dereliction" toward the shipper, the trial court referred to the fact that the train crew to take over at Dodge City was not called until 9:30 P.M., which, according to practice, was for duty on a midnight train.

The trial court apparently treated the allegations of negligent delay in transportation as sufficiently broad to include the tort action. It decided the lawsuit on that theory, and we accept the cause of action as well pleaded. Its findings of actionable negligence on this cause of action are amply supported by the evidence, and they must therefore stand on review.

In the absence of any evidence of the actual weight of the cattle at Dodge City, the trial court determined from competent evidence that the total shrinkage of the cattle en route was 8%, 5% of which was allowed in the purchase contract, leaving 3% to be compensated as damages. Thus, the trial court added a net 3% to the dry weight of the cattle at Emporia, and based on the purchase price, calculated and awarded damages in the sum of $1,718.57.

The carrier raises no objection to the amount of shrinkage, nor does it contend that the purchase price at Emporia was not the market price there. It does, however, strenuously object to the use of this formula as a measure of damages, because it is based upon weights and prices at Emporia, and not at final destination. It invokes the rule that the measure of damages to livestock for delay in shipment is the difference between the market value of livestock in the condition they were when delivered at destination, and the market value in the condition they would have been in if the delay had not occurred. See Kurn v. Westheimer & Daube, 181 Okl. 345, 73 P.2d 835. It also points to the Kansas rule that the measure of damages allowable in cases of this kind is the expense of reproducing the weight or shrinkage shown to have been lost by reason of the negligent acts of the carrier. Colson v. Midland Valley R. Co., 113 Kan. 667, 215 P. 1004. In any event, it is said that the shipper may recover only such damages as may reasonably be supposed to have been in the contemplation of both parties at the time they made the shipping contract. Such is, and has been, the universal rule in contract actions since Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145, 5 Eng. Ruling Cases 502; Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed.

1171; 15 Am.Jur. Damages, p. 451, and cases cited; McCormick on Damages, p. 562. Making application of this rule, it is said that the shipping contract did not provide, nor did the carrier know, that the cattle were to be weighed and sold at Emporia, an intermediate point, and that therefore the weights and prices at that point cannot be the legal basis for the calculation of damages for the breach of the shipping contract—that damages based upon any value other than at point of final destination were not within the contemplation of the parties, and consequently not recoverable.

According to the record, it was not unusual or a special circumstance for cattle destined to points beyond Emporia to be weighed and sold there. It seems to be customary among cattlemen to sell cattle in transit at Emporia, based upon dry weights there, and after feeding and watering at that point, continue to final destination under a through bill of lading. If this be true, it may not be said that the sale of the cattle at weights and prices at Emporia was not reasonably within the contemplation of the parties.

The trial court made no specific finding concerning whether the sale of the cattle at Emporia, based upon weights there, was an unusual or special circumstance. It did rightly observe, however, that the rule relating to the measure of damages, based upon market value at destination, was not inflexible, but applied to the usual situation where cattle are being shipped to market; and that where the factual situation was different, the formula should not be applied. The court's ultimate judgment is based upon the theory of damages that the loss sustained should be compensated; that the breach of duty on the part of the carrier resulted in a loss to the shipper; and that because the loss was determined at Emporia, rather than at final destination, should not deprive the shipper of its right of recovery.

There is nothing in this record to show that the sale price at Emporia was not the market price at final destination, or that the damages would have been lessened by a calculation based upon the market price at point of final destination. Moreover, the cattle were sold at Emporia, and title passed there, hence the shipper did not own the cause of action beyond that point. If he is to recover, it must be upon the basis of weights and prices at Emporia. The law does not deny him recovery for the want of a formula to measure his damages.

Regardless of the rule of "foreseeability" in actions on the breach of a contract, it has no application where, as here, the cause of action sounds in tort. It is well settled that a wrongdoer is liable for all of the natural and probable consequences of his negligent acts, whether within the contemplation of the parties or not. Bartlett v. Federal Outfitting Co., 133 Cal.App. 747, 24 P.2d 877; Western Union Telegraph Co. v. Green, 153 Tenn. 522, 284 S.W. 898; Id., 153 Tenn. 59, 281 S.W. 778, 48 A.L.R. 301; Annot. 48 A.L.R. 318. In the words of Mr. Justice Holmes in Globe Refining Co. v. Landa Cotton Oil Co., supra, 190 U.S. p. 543, 23 S.Ct. 755, "When a man commits a tort, he incurs, by force of the law, a liability to damages, measured by certain rules. When a man makes a contract, he incurs, by force of the law, a liability to damages, unless a certain promised event comes to pass. But, unlike the case of torts, as the contract is by mutual consent, the parties themselves, expressly or by implication, fix the rule by which the damages are to be measured."

It is thus clear that in the assessment of damages, the trial court was not restricted to the narrow rule applicable in contract cases, and urged by the carrier as grounds for reversal. From the evidence adduced here, we cannot say that the damages assessed, based upon the weights and prices at Emporia, are not the probable consequences of the negligent failure of the carrier to notify the shipper of the delay in arrival of the train at Dodge City. The judgment is therefore affirmed.